Filed 9/26/13  P. v. Crespo CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B237218 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA045470) |
| v. | |
| CANDIDO CRESPO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Hayden A. Zacky, Judge.  Affirmed.

Stephen Temko, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, and Eric J. Kohm, Deputy Attorney General, for Plaintiff and Respondent.

_____

Defendant Candido Crespo appeals from the judgment entered following a jury trial in which he was convicted of first degree murder with a finding he personally and intentionally fired a gun, causing death. Defendant raises numerous contentions. We affirm.

## BACKGROUND

About 7:00 a.m. on April 9, 2009, defendant fatally shot Raul Avila, Jr., then shot at Raul Avila, Sr. ("Raul's father"), who pursued defendant as he fled on foot. (Undesignated date references pertain to 2009.) Both Raul and defendant had previously been romantically involved with Samantha Fierroz, and defendant and Fierroz had a son, C.C., who was approximately one year eight months old at the time of the shooting. Fierroz had broken up with defendant in December of 2008, and had rekindled a relationship with Raul in February of 2009. Defendant found out Fierroz was seeing Raul and fought with her about it.

Defendant testified at his trial and admitted he did not like Raul. He was "[r]eally mad" because Raul spent more time with C.C. than defendant did, and he did not want C.C. to view Raul as a father figure. Defendant claimed Fierroz "would always make up excuses" to prevent defendant from seeing C.C., and sometimes said she was at Raul's house. This bothered defendant and he spoke to both Fierroz and Raul about it, but denied telling them to breakup or stay away from one another.

Defendant denied that he had sent Raul a threatening message on MySpace. He claimed Fierroz knew his MySpace password and may have sent the message. The message was dated February 26 and stated, "'What up foo? Me and you have some things to talk about. I want then to meet you somewhere where we can talk in person. If you cooperate, nothing will happen to you whatsoever. But if you don't, then let's just say you fucked with my family, then I'll fuck with yours. And if you tell anybody that I told you this, there's going to be a lot of problems. And remember what hood you stay in. Let me get a number where I can contact you so that we can make arrangements.'"

2

On April 4, Fierroz and Raul took C.C. to a hospital because he had fallen and bumped his head. Defendant found out and met them there. Defendant tapped Raul on the shoulder and suggested they go for a walk. The two men went outside and did not return until Fierroz was leaving the hospital with C.C. Defendant testified that he became angry at the hospital because he learned that C.C. had hit his head while playing with Raul. He asked Raul to step outside, and they spoke about what had happened to C.C. Raul agreed to engage in a fight with defendant, as long as Raul could choose the time and place.

Defendant testified that on April 7 he phoned Raul, who specified the time and place for the fight. Defendant went to the fight with codefendant Ernesto Ruiz. Defendant did not take a weapon to the fight, although he was concerned that Raul would do so. Raul arrived with two men. Raul and defendant punched each other in the face and wrestled on the ground. The fight ended when someone yelled, "'Gun.'" One of Raul's companions pulled out a gun and pointed it at defendant, who turned and ran. Defendant heard a gunshot as he ran. Defendant thought the fight was "a draw," but he testified he remained angry at Raul up through the day of the shooting for giving him a black eye.

Fierroz testified that when Raul came to her home on the night of April 7 he was out of breath, his hands were swollen, and he had scrapes on his back and a red or purple area around one eye. He looked worried and said he needed to go home. Defendant called Fierroz the same night and said he was going home to Bakersfield and would not be able to pick up C.C.

Fierroz testified that on April 8, Raul still seemed worried.

On the morning of April 9, Miguel Ramirez was driving his son to school sometime between 7:00 and 7:15 a.m. when he had to stop briefly at the northeast corner of the intersection of Glenraven and Third Street in Lancaster, while a trash truck maneuvered. Ramirez saw a young man wearing a plaid jacket get out of the passenger side of a white car that was parked on Third Street near the northwest corner of the

3

intersection. The young man was wearing a cap or hood and his face was covered with something like a handkerchief. He straightened his right arm and began quickly running south on Third Street toward Glenraven. Ramirez drove on and lost sight of the man, but about 10 seconds later he heard at least two gunshots. Ramirez looked in his car's mirrors and saw the same young man running south on Third Street. Ramirez also saw the young man turn around and fire at another man, who was also running south on Third Street.

Raul's father testified that he was washing dishes in the kitchen of his home at the southwest corner of Glenraven and Third Street when he heard Raul's car pull into the driveway and park. The window above the kitchen sink looked out onto the driveway. Raul did not live at the house, but he routinely drove one of his sisters to school, returned to the house to eat breakfast, then drove his other sister to school on his way to work. Raul's father looked out the window and saw a man wearing a hood and some type of cloth over the lower part of his face walk up the driveway toward Raul's car. The man stood right by the back door of the car on the driver's side and shot at Raul about three times. Raul's father banged on the window to try to stop the man from shooting.

Raul's father ran outside and chased the gunman, who was running south on Third Street. The gunman turned around and fired at Raul's father, who hid behind a tree. The gunman continued running and Raul's father ran back home to get his truck, but could not locate the gunman again.

Deputy William Edson responded to the crime scene. He interviewed Raul's father, using one of the Avila family members as an interpreter. Edson testified that Raul's father said he did not look out the window until he heard the first gunshot, at which time he saw the shooter standing next to the open driver's door of Raul's car. Raul's father described the shooter as wearing a mask and a black and white checked flannel shirt. He also told Edson that after he banged on the kitchen window, the shooter began backing away, but continued shooting.

4

Raul had three fatal gunshot wounds to his head: one entered at the left temple and went downward toward the right side, one entered at the top of the skull and ended at the base of the skull, and one entered the back of the head on the left and exited on the right side. Deputy medical examiner Louis Pena explained that each one of these three shots would have caused Raul's brain to stop functioning and ended all motor control, meaning he would have dropped where he was when the bullet struck his brain. There was stippling around the left temple entry wound, meaning that the gun had been fired from no more than two feet away. Raul had also been shot in the left hip area. Pena testified that he had seen a crime scene photograph of Raul with the car keys in his right hand.

Photographs of Raul's body in his car showed he was seated in the driver's seat with his legs angled toward the open driver's door, as if he had begun the process of getting out of the car. Both of his feet were inside the car. His left hand was in his lap and his right hand was on the driver's seat, between the center console and his right thigh, holding the car keys.

Numerous members of the Los Angeles Sheriff's Department responded to the scene. Edson testified that Raul's car was parked with the engine off, but the driver's door was open. The rear window on the driver's side was shattered inward and there was a bullet hole in a gate in front of the car. Edson looked inside Raul's car, but did not notice anything other than Raul's body, blood, and the gunshot damage to the car. Detective Jonas Shipe testified he looked inside Raul's car and did not see any weapons, but did see the car keys in Raul's hand. Deputy Brian James testified he photographed the crime scene, including the car with Raul's body in it. He also inspected the interior of the car at the crime scene before coroner's investigator Kim Pavek arrived, but did not see any weapons in it. In particular, he did not see a sword in the car. If he had, he would have photographed it and collected it. He later learned that Raul's car had been towed, and on April 15 he went to the impound lot and took additional photographs of the interior and exterior of Raul's car.

Bullet fragments were recovered at the crime scene, and Pena recovered two bullets from Raul's body. Testing established that they were all fired from a .357 magnum revolver, but no gun was recovered.

Sheriff's personnel learned that a house on Third Street south of the crime scene had a motion-activated exterior surveillance system. The deputies contacted the homeowner and reviewed photos captured by the system around the time of the shooting. They depicted a moving car and someone running. The "video" (consisting of a series of still photos) was shown at trial.

Another sheriff's deputy discovered a bullet strike about six feet above the ground on the tree behind which Raul's father said he had taken cover when the gunman fired at him.

Defendant was quickly identified as a suspect, and Detectives Shipe and Angus Ferguson drove to Bakersfield to speak to him on the afternoon of April 9. They recorded their interview with defendant, and the recording was played at trial. Defendant said that Ruiz had driven him back to Bakersfield the night before, but he stayed at the home of a friend, not his parent's home. Defendant admitted he and Raul had fought and explained they agreed to fight "because [of] the situation with [Raul] and [Fierroz]." Defendant complained that after he and Fierroz broke up, Raul "didn't give us time to make up. . . . So, you know I was mad and I told him c'mon you get I have a kid with her and now I'm not gonna be able to spend time with my family so I had already told you once before you know, stay away please, you know don't come around anymore, I don't want you around my kid because I know the kind of person you are and I know what you do and I don't want that around my son. So, he agreed and then he came back so I told him, hey I told you before, so now, you know, let's, you know, get into a fight, you know let's just deal with it and then after that, you know, not worry about it anymore." Defendant said he had communicated with Raul in person at the hospital and by "chatting" on MySpace. He said, "I sent him a message, told him 'what's up, I told

you not to come around, I want to talk to you, so—'" Defendant denied that he shot Raul or knew who did.

The next day, the detectives returned to defendant's home with a search warrant and in his bedroom they found flannel shirts. Gunshot residue was found on the right cuff and forearm area of one of those flannel shirts.

Detectives Shipe and Ferguson arrested defendant in this case in Bakersfield on April 23. Defendant conversed with the detectives during the drive from Bakersfield to Lancaster. That conversation was recorded and the recording was played at trial. The detectives told defendant he was "busted" and they had a "tight case." They invited him to tell his side of the story, saying things such as, "It comes down to your side of the story, there's first degree premeditated murder and there's heat of passion and obviously you were very passionate about your son. So, if you're just gonna stand mute, nobody's gonna have your side of the story and they're just gonna presume the worst." Defendant did not mention defending himself or acting under the heat of passion.

The detectives had interviewed Ruiz on April 9, 15, and 23, and they arrested him on April 23. They placed Ruiz and defendant together in a holding cell that was equipped with a hidden digital recorder. The audio recording of the conversation between Ruiz and defendant was played at trial. Ruiz repeatedly told defendant that the detectives had shown him photos of the two of them in the car and had impounded Ruiz's mother's car. Defendant asked, "You could tell it's me, you could see my moustache?" Ruiz said he could. Defendant said, "When the fuck, I had that mask and all that shit on the whole time fool." Ruiz replied, "Yeah, but not the whole time." Ruiz said, "The dad saw the car fool." Defendant responded, "Yeah, but he didn't see you." Defendant asked if Ruiz had his hood on in the photos, and Ruiz said he did not. Defendant said, "You should've done that shit." Ruiz said the detectives had asked him about the fight. Defendant asked if Ruiz had told them about the fight. Ruiz replied, "Hmm." Defendant responded "Yeah. I told them too about the fight. I told them like, you told them I had a strap?" Ruiz said, "Nah, I didn't tell them any of that." Ruiz told defendant the

7

detectives had shown him pictures of defendant's "flannel." Defendant repeatedly insisted that they did not have the correct "flannel" because he had three. He also stated that he had showered, dipped his clothing in alcohol, and thrown it in the garage. Defendant asked if Ruiz "told them we had the strap?" Ruiz said, "Yeah, like fool it was hard fool like to fucking, they had pictures already fool. Like they had everything fool." Defendant responded, "Oh so basically by you saying that, you confessed that we did it fool. So we can't fight it huh?" Ruiz agreed they could not. Ruiz added the detectives also had witnesses, and defendant said, "Then we can't fight it." Defendant lamented, "Fuck. See we do this stupid fool [unintelligible]. We should've known, we should've [unintelligible]."

Defendant also said, "That fool wasn't worth it fool. Because I was thinking fool like we should have just let that fool slide and shit [unintelligible]. Which gets me even more mad that he was kickin' it with Samantha and bringing my son [C.C.]" He told Ruiz he had spoken to Fierroz "that same day" and asked her what happened. She had said, "'Don't act innocent, Candido you know what happened.'" Defendant recounted that he had laughed when Fierroz said "something about that fool." Defendant complained that every time he called Fierroz and asked to talk to C.C., Fierroz would say, "'No, not right now,' because she was with that fool donkey." He continued, "Like what the fuck, every time I tried to see him, tell me why I couldn't bitch, because you were with that fool. Fuck you. I did smoke that mother fucker." Ruiz asked if defendant told Fierroz that; defendant said, "No," and laughed again. Defendant later said he was going to tell Fierroz, "I should have let that fool live, because you deserve a fucking man like that in your life."

Defendant stated he and Ruiz were being charged with murder and attempted murder. Ruiz asked, "Oh, because they think that you shot the dad too?" Defendant replied, "I shot him, I hit him [unintelligible] did I fool? Come on." Defendant laughed. Ruiz and defendant discussed statements by the detectives that defendant might receive a death sentence "because of the way he died." Defendant explained, "He had no, he had

8

no way of defending himself. He was just sitting in his car. He didn't know what was coming to him." After Ruiz asserted that Raul "knew what was coming to him," defendant said, "I can't believe that fool didn't even like [unintelligible] that fuck didn't know all that shit. Fool didn't even take no precaution."

Ruiz stated the detectives had said he could probably get a deal if he testified against defendant. Defendant repeatedly urged Ruiz to testify against him and offered to take all of the blame. Defendant said he was going to get a life sentence, anyway. Defendant devised and repeatedly revised a story that both he and Ruiz could tell the detectives to place the blame on defendant and exonerate Ruiz.

Shipe testified that a "strap" referred to a gun.

Pavek testified that she arrived at the crime scene about 11:40 a.m. on April 9 and photographed it before removing Raul's body. Raul had the car keys in his right hand. Pavek photographed that, but did not collect the keys. During her testimony, she provided the defense with her photograph of the keys in Raul's hand, which was taken from the driver's side of the car and clearly depicted the buttons on the front of the car's keyless entry system remote control attached to the keys. Photos introduced earlier in the trial depicted Raul's hand from the passenger side of the car, showing only the side and back of the remote control.

Pavek also testified that she observed and photographed "'a small sword-type weapon on the right-rear floor board.'" It was in "a sheath," but looked like a weapon to her. During her testimony, she provided the defense with her photograph of the sword. Defense counsel asked if she turned her photographs "over to the lawyers." She said she did not know if that had been done and added, "They would have to subpoena that." Asked if she gave them to the detectives, she said, "They can get copies from our department." Pavek did not remove the keys, the sword, or any other object from the car and did not know where they were at the time of trial.

Shipe testified that he chose not to inventory or remove the contents of Raul's car at the crime scene out of sensitivity toward Raul's family. He instead had the car

9

impounded and processed at the impound yard.  He looked inside the car at the crime scene and did not see the sword.  He did not know what had happened to the sword, but he had made inquiries after the issue arose during trial.  No one seemed to know where it was.  Shipe did not know what happened to the car keys, either, but if the Avila family claimed the car, they would have received the keys at that time.

Maria Juarez testified that she commenced a romantic relationship with defendant in January of 2009.  She knew defendant had a young child but had never seen C.C.  She had never seen defendant shirtless and did not know he had a tattoo on his chest, although she knew about one on his back.  The prosecutor showed Juarez a photograph of the tattoo on defendant's chest, which read "Always, Candido and Samantha forever."  Defendant testified that he had gotten the tattoo on his chest just after C.C. was born.

Defendant testified that he falsely told Fierroz after the fight on April 7 that he was on his way back to Bakersfield and falsely told her on April 8 that he was in Bakersfield.  He did this to deceive her regarding his location.  On April 8 he was "partying."  He woke up with a hangover on April 9 and went to Ruiz's house to ask for a ride back to Bakersfield.  Defendant and Ruiz smoked some marijuana.  Defendant was still angry about Raul giving him a black eye in the fight, and he decided to vandalize Raul's father's home, although he did not know where it was.  He grabbed a can of spray paint he found at Ruiz's home and Ruiz's revolver for "protection" because he "was scared" and did not "know what Raul might have done."  Defendant checked to make sure the gun was loaded.  He did not tell Ruiz he had taken the gun.

Defendant testified Ruiz knew where Raul's father's lived and drove him there.  Ruiz stopped on Third Street for defendant to get out and was going to pick him up farther south on Third.  Defendant was wearing a hood, but not a mask.  He initially jogged toward the house, then slowed to a walk.  He intended to break windows and tag the house.  He thought Raul would be at Fierroz's house, and he did not expect anyone in the home to be awake because it was "so early" in the morning.  As he neared the house,

10

he saw Raul's father at the window and turned to leave. At just that moment, Raul drove into the driveway.

Defendant testified Raul called to him by name and asked him what he was doing there. Raul appeared to turn to his right, as if to retrieve something, then opened the door and began to get out of the car. Defendant was about two feet from the driver's door of Raul's car and saw an object that had a silver glare to it in Raul's hand. At trial, defendant testified he believed the object he saw in Raul's hand was the car keys, but at the scene, defendant presumed Raul was holding a gun or a knife. When they were in high school together defendant had once seen Raul with a knife and had been told by other people that Raul was known to carry a knife. Defendant thought Raul was going to attack him, so he pulled the gun from his waistband and began firing at Raul. He fired the first shot from three to four feet, then continued to fire as he walked backward toward the street. He "couldn't help but pull the trigger." The recoil of each shot pushed defendant back, and he had to "position[]" himself with his feet before pulling the trigger the next time. Defendant had never fired a gun before and was frightened, but he did not intend to kill anyone. He did not know where he shot Raul, but denied shooting him from behind. Raul moved back into the car, and defendant ran away.

Defendant testified that as he ran, he heard someone yelling and chasing him but did not know who it was. He turned and saw someone hiding behind a tree. Defendant wanted to scare him, so he fired "a warning shot" toward the tree, then continued running. Defendant discarded the gun before he got to Ruiz's car. At some unspecified time, defendant also discarded the can of spray paint. Ruiz drove defendant home to Bakersfield.

Defendant admitted that he never mentioned to any law enforcement officer that he had seen or thought he had seen a weapon in Raul's hand. The detectives were not nice to him when they drove him from Bakersfield to Lancaster. They frightened and angered him. Defendant admitted he was "mostly lying" to them both times they spoke to him, but there was "a little bit of truth" in what he said.

11

Defendant testified that when he was in the holding cell with Ruiz, he was scared that he would go to prison for the rest of his life, so he tried to "make up excuses to try to get away" and to prevent Ruiz from getting in trouble because Ruiz had not known "what was going on." Defendant also wanted to seem brave and make Ruiz feel better. Defendant admitted that he laughed several times during the conversation with Ruiz.

Forensic psychiatrist Dr. Ronald Markman testified that stress can produce an impulsive and uncontrolled reaction, although a broad spectrum of effects are possible, and it is possible for a person to control his reactions under stress. Stress can also affect a person's perception of a potential threat. The use of marijuana can either minimize a person's perception of stress or cause someone to act impulsively.

Fierroz testified she never knew Raul to carry a knife and never saw the sword. She denied knowing defendant's MySpace password and writing the threat to Raul on MySpace.

Ivan Avila testified he was very close with his younger stepbrother, Raul. Raul told Ivan that he was scared of defendant. Ivan never saw Raul with a knife or a sword.

Defendant and Ruiz were tried together by a single jury, but Ruiz accepted a plea offer during the presentation of defendant's case. The jury convicted defendant of first degree murder and found he personally and intentionally fired a gun, causing death. It acquitted defendant of attempting to murder Raul's father. The court sentenced defendant to prison for 50 years to life, consisting of a term of 25 years to life for the murder plus a term of 25 years to life for the firearm enhancement.

## DISCUSSION

**1.    Failure to "preserve" the sword**

Defendant first contends that "[l]aw enforcement officials were under an affirmative obligation to preserve the sword because it was clear the sword had evidentiary value and would be expected to play a significant role in [defendant's] defense." He contends their "failure to preserve the sword" violated due process.

As a matter of due process, law enforcement agencies have a duty to preserve evidence that might be expected to play a significant role in the suspect's defense. Such "evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." (*California v. Trombetta* (1984) 467 U.S. 479, 488–489 [104 S.Ct. 2528].)  If all that a defendant can say about the unpreserved evidence is that it could have been tested and the results might have helped the defense, the defendant must show that the police acted in bad faith in losing or disposing of the material. (*Arizona v. Youngblood* (1988) 488 U.S. 51, 57–58 [109 S.Ct. 333]; *People v. DePriest* (2007) 42 Cal.4th 1, 42.)  "The presence or absence of bad faith by the police . . . must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." (*Youngblood*, at p. 56, fn. *.) Negligent destruction of, or failure to preserve, potentially exculpatory evidence, without evidence of bad faith, does not violate due process. (*Id.* at p. 58.)

Pavek's photo showed the sword lying on the floor of the backseat, on the passenger-side of the car. Raul was seated in the driver's seat with his legs angled toward the open driver's door, as if he had started the process of getting out of the car. His left hand was in his lap and his right hand was on the driver's seat, between the center console and his right thigh, holding the car keys. Given the relative positions of the sword and Raul and the presence of the car keys in Raul's right hand, which was closer to the sword than his left hand, it would have been apparent to law enforcement officers responding to the scene that Raul was not holding the sword when he was shot. Thus, even if someone from the sheriff's department had seen or known about the sword before it disappeared, the sword did not possess apparent exculpatory value. Nor was the sword of "such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." Pavek's photograph of the sword provided defendant with comparable evidence under the circumstances. Although defendant probably would have preferred to introduce into evidence the actual sword

13

instead of a photograph of it, doing so would not have strengthened his defense because it was clear that Raul had not been holding it when defendant shot him.

Defendant argues that "DNA testing may have showed [defendant's] blood, hair or skin cells were on the sword. This would have shown [Raul] touched the sword immediately after the fight with [defendant] and transferred that DNA material to the sword. Such evidence would have indicated [Raul] was prepared to retaliate with deadly force right after the fight." This contention consists of multiple layers of speculation that, even if proved, would not have benefited defendant because defendant's defense turned on what Raul did in the moments before defendant began firing the gun, not what Raul was "prepared to" do two days earlier. In addition, defendant's contentions that the sword could have been tested and the results might have helped the defense require him to show that the police acted in bad faith, which he has admittedly failed to do. He argues he would have been able to show bad faith if the trial court had conducted an evidentiary hearing, but sheriff's personnel testified at trial that they did not see the sword in the car and there is no reason to believe different testimony would have been elicited at an evidentiary hearing. Defendant further suggests that the failure of sheriff's personnel to search the vehicle at the crime scene constituted "a complete lack of good faith." Shipe testified that he chose not to process the car at the Avila home due to sensitivity toward the Avila family. Combined with evidence that sheriff's personnel did not know about the sword, the failure to search the car at the Avila home demonstrates neither bad faith nor a lack of good faith.

For all of these reasons, defendant's due process claim has no merit.

## 2. Violation of due process by failure to disclose sword photograph

Defendant contends the prosecutor's failure to obtain Pavek's photograph of the sword and disclose it to him violated *Brady v. Maryland* (1963) 373 U.S. 83, 87 [83 S.Ct. 1194] (*Brady*), which requires the prosecutor to disclose to the defense all material exculpatory evidence—including impeachment evidence regarding prosecution witnesses—known to the prosecution team. (*United States v. Bagley* (1985) 473 U.S.

14

667, 676 [105 S.Ct. 3375]; *In re Brown* (1998) 17 Cal.4th 873, 879; *People v. Tillis* (1998) 18 Cal.4th 284, 294; *People v. Jordan* (2003) 108 Cal.App.4th 349, 358.) No *Brady* violation occurs if the evidence is presented at trial, even if it was not previously disclosed during discovery. (*People v. Verdugo* (2010) 50 Cal.4th 263, 281 (*Verdugo*).)

Materiality requires a showing of a reasonable probability that, had the evidence been disclosed to the defense, the result of the trial would have been different. (*Kyles v. Whitley* (1995) 514 U.S. 419, 433–434 [115 S.Ct. 1555] (*Kyles*).) Such a reasonable probability exists where the undisclosed evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." (*Id.* at p. 435.) "'The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish "materiality" in the constitutional sense.' [Citation.]" (*People v. Fauber* (1992) 2 Cal.4th 792, 829, quoting *United States v. Agurs* (1976) 427 U.S. 97, 109–110 [96 S.Ct. 2392].)

Because Pavek provided the photograph of the sword to defendant during trial and defendant introduced the photograph as an exhibit, no *Brady* violation occurred, notwithstanding any delay in disclosure. In addition, the photograph of the sword was not material exculpatory evidence because the location and position of Raul's body in the driver's seat, the presence of the car keys in his right hand next to his right leg, the location of the sword on the floor of the back seat on the passenger side, and Pena's testimony that any of the head shots would have caused Raul to drop immediately established that Raul did not have the sword in his hand when he was shot. Even if he reached for it, he did not retrieve it because the car keys were in his right hand—the hand closest to the sword—while the sword remained on the floor. Defendant never claimed or testified that he saw the sword in Raul's hand or the car or that he thought Raul possessed, retrieved, or held a sword. Instead, defendant testified that he thought Raul had a knife or gun in his hand, but realized at trial it was the car keys. Indeed, defendant effectively disclaimed any theory that he thought Raul had the sword in hand or was

15

reaching for it by arguing to the jury that he did not "take the stand and say [Raul] was going for the sword[.] [Defendant] never said that because he was telling you the truth." For all of these reasons, the sword could not "reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." (*Kyles*, *supra*, 514 U.S. at p. 435.)

To the extent defendant may be challenging the prosecutor's failure to obtain and disclose Pavek's photograph of the car keys in Raul's hand, his *Brady* claim fails because Pavek provided defendant with the photograph during trial and he introduced the photograph as an exhibit. In addition, we note that on the first day of testimony during the prosecution's case-in-chief, defendant introduced two exhibits depicting a passenger-side view of Raul's body, including his right hand. These photographs clearly showed a small black or grey rectangular object in his hand. Defendant also cross-examined Edson about whether he saw that object and asked, "Keys in [Raul's] hands would support that theory that the engine was not running. Does that sound right?" On the morning of September 16, 2011, the fourth day of testimony, Pena testified that he had seen a photograph of Raul seated in the car, holding the keys in one hand. Defendant did not begin presenting his case until September 19, 2011. Defendant obtained Pavek's photo of Raul's right hand before he testified, and he utilized that photograph to support his testimony that he saw an object in Raul's hand that had a "silver glare to it."

**3. Violation of discovery statute by failure to disclose sword photograph**

Defendant contends that the prosecutor's failure to obtain Pavek's photograph of the sword and disclose it to him before trial violated her statutory obligation under Penal Code section 1054.1, subdivision (c), which provides that the prosecutor shall disclose "[a]ll relevant real evidence seized or obtained as a part of the investigation of the offenses charged" "if it is in the possession of the prosecuting attorney or if the prosecuting attorney knows it to be in the possession of the investigating agencies." (Undesignated statutory references are to the Penal Code.) He argues, "Obviously, someone associated with the district attorney's office knew well before trial that Ms.

16

Pavek had filed a report about seeing the sword in the car because that person included the notation of the sword in the murder book. . . . The prosecution should have obtained all of the coroner's records, including Ms. Pavek's records, and transferred them to the defense."

Even if Pavek's photograph of the sword fell within the scope of "relevant real evidence seized or obtained" by an investigating agency "as a part of the investigation of the offenses charged," defendant has not met his burden of demonstrating a reasonable probability that he would have obtained a more favorable outcome if the prosecutor had obtained the photograph and provided it to him before trial. (*Verdugo*, *supra,* 50 Cal.4th at p. 280.) The record shows that defendant knew before trial that Pavek had reported that she had seen and photographed the sword, and he had subpoenaed Pavek to testify. The court and counsel addressed the issue of the sword on September 12, 2011, before the first prosecution witness testified. At that time, defense counsel told the court that particular pages of the "murder book" contained the following entry: "'I discovered a small sword-type weapon located on the floor board behind the front passenger seat. This item was collected, along with the vehicle and its contents, by L.A.S.D. homicide as evidence.'" Defense counsel then read a second entry from the "murder book" to the court: "'I also noted a small sword-type weapon on the right rear floor board. I took 33 pictures.'" Thus, neither the presence of the sword nor the existence of a photograph of it was a surprise to defendant. Defendant obtained the photograph of the sword when Pavek testified in the defense case on September 19, 2011, no trial proceedings occurred on September 20, 2011, and defendant testified on September 21 and 22, 2011. Thus, defendant was aware a sword had been found all along and he had the photograph of it two days before he began testifying. He then had a day off from the trial in which to incorporate the presence of the sword into his defense theory. Defendant argued in his *Brady* claim that earlier disclosure would have enabled defense counsel to be "better prepared to present the defense," but he fails to explain why or how counsel would have been better prepared, and he fails to suggest any differences in the defense that would

17

have resulted from earlier disclosure.  As the California Supreme Court stated in *Verdugo*, *supra*, 50 Cal.4th at pages 281–282, "Without elaboration, defendant also asserts that he 'could not properly or effectively prepare for cross-examination of witnesses,' that 'his ability to impeach the witness[] was adversely impacted,' and that '[t]imely disclosure of the information would have enabled counsel to adjust his theory of the case to fit the facts.'  Such generalized statements are insufficient to demonstrate prejudice.  Defendant does not explain what counsel would have done differently if the notes had been disclosed sooner."

In addition, for the same reasons that the photograph of the sword was not material exculpatory evidence, we conclude there is no reasonable probability that he would have obtained a more favorable outcome if the prosecutor had obtained the photograph and provided it to him before trial.

Defendant also argued in his *Brady* claim that earlier disclosure would have enabled defense counsel to impeach James and Shipe on cross-examination during the prosecution's case-in-chief.  Defendant knew Pavek had found the sword before trial began and thus had sufficient information to question James and Shipe about the sword if the trial court had permitted him to do so.  But when the court and counsel discussed the sword evidence on September 12, 2011, before the prosecution case began, the court ruled that unless and until evidence was introduced "that puts a weapon in the victim's hands at or near the time of the murder, then the fact that the items were found in the car or seen in the car is irrelevant."  After the prosecution rested, the court reversed its ruling and found evidence of the sword relevant in light of the prosecutor's inquiries to various law enforcement officers about seeing any weapons in the car.  Thus, it was the court's ruling on the relevance of the sword evidence, not the delayed disclosure of that evidence, that prevented defendant from using the sword to somehow impeach James or Shipe when they testified in the prosecution's case-in-chief.  After the court agreed to admit evidence regarding the sword, defendant called Shipe as a witness and questioned him about the sword, which Shipe testified he never saw.  Defendant could also have

18

called James as a witness if he believed doing so would have benefited his defense. Defendant has not shown he was prejudiced by the delayed disclosure.

**4.      Defense counsel's failure to obtain photograph of sword from Pavek**

Defendant contends that his trial attorney "was ineffective because he should have obtained the photograph of the sword himself, instead of waiting for the prosecution to disclose it to him."

A claim that counsel was ineffective requires a showing, by a preponderance of the evidence, of objectively unreasonable performance by counsel and a reasonable probability that, but for counsel's errors, the defendant would have obtained a more favorable result. (*In re Jones* (1996) 13 Cal.4th 552, 561.)

We need not address whether the performance of defendant's trial attorney was objectively unreasonable because, for all of the reasons stated in defendant's discovery violation claim, defendant has not shown a reasonable probability that he would have obtained a more favorable outcome if counsel had obtained the photograph earlier.

**5.      Prosecutorial misconduct**

Defendant contends that the prosecutor committed numerous acts of misconduct falling into six categories.

"A prosecutor's conduct violates a defendant's federal constitutional rights when it comprises a pattern of conduct so egregious that it infects '"the trial with unfairness as to make the resulting conviction a denial of due process." [Citation.]' [Citation.] . . . Conduct that does not render a trial fundamentally unfair is error under state law only when it involves ""the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.'" [Citations.]'" (*People v. Bennett* (2009) 45 Cal.4th 577, 594–595 (*Bennett*).)

Reversal of a judgment of conviction based on prosecutorial misconduct under state law is appropriate only when, after reviewing the totality of the evidence, we can determine it is reasonably probable that a result more favorable to defendant would have occurred absent the misconduct. (*People v. Bolton* (1979) 23 Cal.3d 208, 214.)

19

Prosecutorial misconduct constituting federal constitutional error is subject to harmless error analysis under the standard of *Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824]:  the Attorney General has the burden of proving beyond a reasonable doubt that the error did not contribute to the verdict.  (*People v. Bell* (1989) 49 Cal.3d 502, 534.)

To preserve a claim of prosecutorial misconduct for appeal, the defendant must make a timely objection at trial on the ground asserted on appeal and request an admonition; otherwise, the point is reviewable only if an admonition would not have cured the harm or objection would have been futile.  (*Bennett*, *supra*, 45 Cal.4th at p. 595.)

### a.    Failure to disclose photograph of sword at start of trial

When the court and counsel discussed the evidence of the sword on September 12, 2011, before the first witness testified, the prosecutor stated that Pavek "has a picture of it."  The prosecutor subsequently stated, "I just wanted to clarify, though.  When you look at the picture, it looks like a stick."  Defendant contends that the prosecutor engaged in misconduct by failing to disclose Pavek's photograph of the sword when the prosecutor saw it.

The prosecutor's failure to obtain and turn over the photograph neither infected defendant's trial with unfairness nor involved the use of deceptive or reprehensible methods to attempt to persuade the court or the jury.  Defendant knew Pavek had found the sword and photographed it, and he had her under subpoena.  He could also have subpoenaed her photographs before trial.  In addition, for the reasons previously addressed, defendant was not prejudiced by the delay in obtaining the photograph.

### b.    Failure to advise Fierroz not to mention certain things

Before trial, the trial court excluded evidence of defendant's probationary status.

Fierroz testified she received a call from defendant to her mobile phone on the night of April 7 that she did not answer, but defendant left a message.  The prosecutor asked, "And what did he say in the message?"  Fierroz responded, "That he wasn't going

to be able to pick up my son because he had community service." The court sustained defendant's objection and struck "[t]he last part." The court summarized, "So he said he couldn't pick up your son because he has a prior obligation." Fierroz spontaneously added, "He was going to Bakersfield."

Defendant moved for a mistrial. The prosecutor informed the court that she had told Fierroz not to mention probation or gangs. The court denied the motion.

Defendant contends the prosecutor committed misconduct by failing to advise Fierroz not to mention defendant's probationary status. As far as the record reveals, the prosecutor did advise Fierroz not to mention defendant's probationary status. Fierroz may have either understood this advisement in quite a literal fashion or decided to disregard it, but nothing indicates that the prosecutor committed misconduct.

In addition, the court sustained defendant's objection and struck Fierroz's reference to community service, and it repeatedly instructed the jury to disregard stricken testimony (CALCRIM Nos. 104, 222). We presume the jury followed that instruction. (*People v. Avila* (2006) 38 Cal.4th 491, 574.)

Defendant further complains that the prosecutor failed to advise Fierroz in relation to the following testimony: the prosecutor asked Fierroz to describe Raul's demeanor when he returned to her house after the fight; Fierroz replied, "He was still breathing hard. And he seemed concerned that something was going to happen at his mom's house that night, so he was eager to get home." The court sustained defendant's objection and struck the "last portion." The prosecutor then asked, without objection, "Did he seem anxious in any way? [¶] Just demeanor. Not what he said." Fierroz replied, "He looked worried." Defendant made another motion for mistrial, which the trial court denied.

The prosecutor did not commit misconduct. She asked about Raul's demeanor and Fierroz gave a nonresponsive answer. The trial court sustained defendant's objection and struck the testimony. In light of the court's actions and its repeated instructions to the jury to disregard stricken testimony (CALCRIM Nos. 104, 222), no prejudice was possible under any standard.

21

**c.      Asking Shipe whether defendant was honest in the first interview**

On redirect, the prosecutor asked Shipe if defendant was honest during the April 9 interview.  The trial court sustained defendant's objection before Shipe responded.  Defendant later made another motion for mistrial, which the trial court denied.  On appeal, defendant contends the prosecutor's question constituted misconduct.

The prosecutor's question sought an irrelevant and inadmissible opinion and was thus improper.  (*People v. Zambrano* (2004) 124 Cal.App.4th 228, 239–241; *People v. Bonin* (1988) 46 Cal.3d 659, 689 [prosecutor commits misconduct by purposefully eliciting inadmissible testimony], overruled on another ground in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1.)  But the question implied nothing harmful, was not a deceptive or reprehensible method of attempted persuasion, and did not render defendant's trial unfair.  No prejudice was possible under any standard.  The trial court sustained defendant's objection and Shipe did not answer the question.  The jury was fully able to draw its own conclusions as to defendant's honesty by comparing his statements in the first interview to his other statements, his trial testimony, and the remaining evidence regarding what happened.  Notably, defendant admitted in his testimony that he was "mostly lying" in his statements to the detectives on April 9 and April 23.  In addition, the court repeatedly instructed the jury that questions are not evidence and the jury should ignore any question to which the court sustained an objection (CALCRIM Nos. 104, 222).

**d.      Asking Juarez about her relationship with defendant**

Defendant complains of several questions the prosecutor asked Juarez on cross-examination.  First, the prosecutor asked whether Juarez had dated defendant from January of 2009 "continuously up to today."  Defendant did not object.  Juarez responded, "We have been together since the whole thing."  The prosecutor asked Juarez if she had ever seen defendant without a shirt.  Defendant did not object.  Juarez responded, "No."  The prosecutor followed by asking, "You never went to the beach?"  Defendant did not object.  Juarez said, "No."  The prosecutor asked Juarez if she was

"aware of something he had on his chest." Defendant did not object. Juarez responded by saying she knew he had a tattoo on his back but had never seen it. Defendant asked to approach, and an unreported bench conference was held. Afterward, the prosecutor asked whether Juarez and defendant had gone swimming together. Defendant did not object. Juarez replied, "No." Defendant subsequently made another motion for mistrial, which the court later denied.

Defendant forfeited his prosecutorial misconduct claims regarding these questions by failing to object to them in the trial court. Even if he had preserved his claims, we would reject them. While the answers to the questions may have cast doubt upon the depth of the relationship between Juarez and defendant, there was nothing improper about any of the questions. With respect to the tattoo, the prosecutor showed Juarez a photograph of the tattoo on defendant's chest, which depicts two hearts and a ribbon with the words "Always Candido And Samantha Forever," and asked if she had ever seen it. Thus, the jury was made aware that the prosecutor was not referring to a gang tattoo, but to a tattoo reflecting defendant's attitude toward Fierroz.

e.    **Asking defendant about threat to Raul**

Before trial, defendant asked the court to exclude all statements Raul made to anyone else on the ground that they were hearsay. The prosecutor sought to admit statements Raul made to his family and Fierroz that reflected his state of mind, specifically that he agreed to fight defendant because defendant had threatened to harm Raul's family. The prosecutor believed Raul's statements were admissible under Evidence Code section 1250, but later modified her stance and said she would only introduce such statements "if the defense brings it out and it's misrepresented as to how the fight occurred." The trial court excluded such statements in the prosecution's case-in-chief as double hearsay, but agreed to consider admission of such statements if the prosecutor sought to admit such statements "later on."

During cross-examination of defendant, the prosecutor asked whether defendant had ever told Raul to stay away from Samantha or warned Raul that he had better listen

23

to defendant. Defendant denied making such statements. The prosecutor then asked, "Did you ever tell [Raul] that he better listen to you, leave [Fierroz] alone, or you would kill the first person that steps out of his house?" Defendant immediately objected, and the court sustained the objection. The defense wanted to approach the bench, but agreed to discuss the matter later.

After the jury had been dismissed for the day, the court discussed the question and objection with the parties. The court asked the prosecutor whether she had "a good faith belief for believing it was true." The prosecutor replied that Raul's brother, whom she intended to call as a rebuttal witness, was prepared to testify that Raul told him about threats defendant had made to Raul. She added, "And they were the exact words, and he will testify to that." She further stated that the threat was relevant to refute defendant's self-defense claim. Defendant again moved for a mistrial. The court stated it would have preferred that the prosecutor had asked to approach before asking the question, but it did not rule on the admissibility at that time. When the trial resumed the next day, the court reminded the jury that the questions of the attorneys were not evidence.

Before the prosecutor called any rebuttal witnesses, the court conducted an evidentiary hearing with Raul's brother, Ivan, outside the presence of the jury. Ivan testified that Raul had told him that defendant said "that if [Raul] got involved with his family, he was going to get involved with our family. [¶] And the first one to come out of the house with my dad would get killed. Or from my uncle's house." The prosecutor asked if Raul told Ivan how the threats made Raul feel. Ivan replied, "Yes. He was scared. That's why he wanted to talk to [defendant]."

The court reaffirmed its prior ruling excluding testimony about the threats as double hearsay. The court further ruled that Ivan would be allowed to testify only that Raul said he feared defendant, and defendant could ask Ivan when Raul said that.

"It is misconduct for a prosecutor to ask a witness a question that implies a fact harmful to a defendant unless the prosecutor has reasonable grounds to anticipate an

answer confirming the implied fact or is prepared to prove the fact by other means." (*People v. Price* (1991) 1 Cal.4th 324, 481.)

The prosecutor did not commit misconduct or violate the court's initial ruling. The trial court initially precluded the prosecutor from admitting in her case-in-chief any multi-level hearsay testimony by Fierroz or any of Raul's siblings about the threat. The prosecutor complied with that ruling. Asking defendant on cross-examination if he had made that threat did not call for inadmissible multi-level hearsay from Fierroz or any of Raul's siblings.

Nor did the prosecutor commit misconduct by asking a question implying a fact harmful to defendant because she was prepared to prove the implied fact (that defendant made the threat) by calling Raul's brother Ivan as a rebuttal witness.

In addition, the trial court sustained defendant's objection and defendant did not answer the question. The court repeatedly instructed the jury that questions are not evidence and the jury should ignore any question to which the court sustained an objection (CALCRIM Nos. 104, 222), and specifically reminded the jury of this principle when the trial resumed the next day. We presume the jury obeyed that instruction.

## f.  Improper argument

If a prosecutorial misconduct claim is based on the prosecutor's arguments to the jury, we consider the challenged statements in the context of the argument as a whole, and determine whether it is reasonably likely that the jury construed or applied any of the challenged statements in an objectionable fashion. (*People v. Cole* (2004) 33 Cal.4th 1158, 1202–1203 (*Cole*).)  No misconduct exists if a juror would have taken the statement to state or imply nothing harmful. (*People v. Benson* (1990) 52 Cal.3d 754, 793.)  "'[W]e "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.'  [Citation.]" (*People v. Dykes* (2009) 46 Cal.4th 731, 772.)

A prosecutor has wide latitude to discuss, argue reasonable inferences from, and comment upon the evidence. (*Cole*, *supra*, 33 Cal.4th at p. 1203.) Whether the inferences the prosecutor draws are reasonable is for the jury to decide. (*Ibid.*)

Defendant contends the prosecutor engaged in misconduct four times during her arguments to the jury.

**(i)     Defendant said he had a gun at the fight**

First, defendant complains that, after the prosecutor played a portion of the recorded jail conversation between defendant and Ruiz, she argued, "[Y]ou heard the defendant testify in court that he did not have a gun at this fight. But when he was talking to [Ruiz], they talked about having the gun at the fight."

Defendant objected that this misstated the evidence, and the court told the jury, "[T]he evidence is for you to decide. You have heard the evidence. You can listen to the recording. You can draw whatever inference you think is appropriate based on the recording itself. [¶] Remember, the statements of the attorneys is [*sic*] not evidence."

The prosecutor's argument was not misconduct. She argued a reasonable inference from the portion of the jail conversation in which, in the context of discussing what Ruiz had told the detectives about the fight, defendant asked Ruiz, "[Y]ou told them I had a strap?" Shipe had testified that a "strap" meant a gun. In addition, the court reminded the jury that it could draw its own inferences from the recording.

**(ii)     Defendant was waiting for Raul**

Defendant next complains that the prosecutor improperly argued that he knew Raul was about to drive up to the house and was waiting for him. In the course of arguing that the evidence showed premeditation and deliberation, the prosecutor argued the following: defendant lied to Fierroz about being on his way back to Bakersfield and later in Bakersfield, and, as shown by Ramirez's testimony, defendant parked near Raul's house at 7:00 a.m., got out of car with his face covered, ran toward Raul's house, and shot Raul seconds later. The prosecutor then argued, "That shows that defendant was waiting for Raul to come home, because he met him simultaneously as [Raul] pulled up

26

into the driveway. That's not a coincidence. Because when you consider everything surrounding that, that was planned out and he knew when Raul was coming in to that driveway."

Defendant objected that this was improper and there was "no evidence of that." The court again told jury, "[T]he evidence is for you to decide based on what you have heard. All right? I know the attorneys are trying to give their position. If you need readback of testimony to get the specifics, you can ask my court reporter."

The prosecutor's argument was not misconduct. She merely argued a reasonable inference from the evidence. Defendant admitted he lied to Fierroz twice about going back to Bakersfield and being back in Bakersfield so she would not know he was still in Lancaster. Although defendant claimed he did not think Raul would be at the house or that anyone at the house would be awake because it was "so early" in the morning, he admitted he took Ruiz's gun "for protection" because he did not know what Raul might do. Defendant arrived either just before (according to his own testimony) or just after (according to the testimony of Raul's father) Raul. And defendant's statement to Ruiz in the recorded jail conversation implied that defendant had planned to shoot Raul in the driveway: "He was just sitting in his car. He didn't know what was coming to him."

**(iii) Raul was afraid of defendant**

While addressing the defense theory of unreasonable self-defense, the prosecutor argued, without objection, "There's no evidence that defendant was afraid of Raul. There's evidence that Raul was afraid of the defendant based on what defendant said to him and did to him before the murder."

A little later, the prosecutor argued, "[A]ll the evidence shows that Raul was afraid of the defendant." Defendant objected and asked, "Where is that evidence, your honor?" The court replied, "There was one reference to the victim's state of mind regarding fear, and that was on Thursday. Other than that, there was no evidence presented in the courtroom. [¶] Again, ladies and gentlemen, you heard the evidence. You decide what

27

the evidence is in the case. It's a long trial. If you need to hear readback from the reporter, she has it all written down."

The prosecutor's argument was not misconduct. Raul's brother Ivan testified that Raul said he feared defendant.

**(iv)   Defendant was cold-blooded and glad he got rid of Raul**

Citing *People v. Mince*y (1992) 2 Cal.4th 408, 447 (*Mince*y), and *People v. Frye* (1998) 18 Cal.4th 894, 975–976 (*Frye*), disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, footnote 22, defendant argues the prosecutor improperly stated her personal belief in the following argument: "And based on the testimony, based on the evidence, based on everything, you know, defendant has no remorse for killing Raul. He is cold blooded and I believe to this day he is glad that he got rid of him." The trial court sustained defendant's objection and struck the "last part."

In *Mince*y, *supra*, 2 Cal.4th 408, the defendant challenged three statements by the prosecutor as improper expressions of a personal belief or opinion. In his opening statement the prosecutor said that he thought at the end of the case there would be "'no serious issue'" that the victim had been tortured to death. In his closing argument the prosecutor argued, "'I think on that issue, it is clear that Mr. Mincey is the most legally culpable. He is the actual, based on the credible evidence, the actual physical perpetrator of the death of James.'" The prosecutor further argued, "'[T]he prosecution clearly believes and expects you to believe that Sandra . . . was involved in this beating. We believe and you should believe that [defendant] was the primary perpetrator. There are lots of reasons, but the biggest reason is Wendy's testimony.'" (*Id.* at p. 447.) The California Supreme Court stated, "A prosecutor may not express a personal opinion or belief in the guilt of the accused when there is a substantial danger that the jury will view the comments as based on information other than evidence adduced at trial. [Citation.] The prosecutor's comments must, of course, be evaluated in the context in which they were made, to ascertain if there was a substantial risk that the jury would consider the remarks to be based on information extraneous to the evidence presented at trial.

[Citation.] Each of the prosecutor's remarks challenged here was specifically made in reference to evidence that the prosecutor intended to, and did, introduce at trial. Under the circumstances, there was no substantial risk that the jury would interpret the prosecutor's remarks as referring to information other than evidence adduced at trial." (*Id.* at pp. 447–448.)

In *Frye*, *supra*, 18 Cal.4th 894, the prosecutor stated in her guilt-phase closing argument in a death penalty case that "this phase" of the trial was almost over. Frye argued on appeal that this "impermissibly communicated to the jury her belief that the penalty phase of trial would occur because a guilty verdict was inevitable." (*Id.* at p. 975.) The court rejected Frye's prosecutorial misconduct claim, stating, "A prosecutor may not give a personal opinion or belief as to the defendant's guilt if it will suggest to the jury the prosecutor has information bearing on guilt that has not been disclosed at trial. [Citations.] However, a prosecutor is permitted to offer an opinion on the state of the evidence. [Citation.] This is precisely what occurred here. There was no misconduct." (*Id.* at pp. 975–976.)

The prosecutor's arguments that defendant "had no remorse" and was "cold blooded" were reasonable inferences from defendant's repeated laughter during the jail conversation as he and Ruiz discussed the crime and defendant's statement in the same conversation, "I did smoke that mother fucker."

The prosecutor's argument that she believed "to this day he is glad that he got rid of" Raul was arguably improper, in that the jury may have inferred that this was based upon information that was not introduced in evidence at trial. But, when considered in context, this statement was a paraphrasing of the "no remorse" remark in the prior sentence, which was both actually and expressly based upon "the testimony" and "the evidence." Thus there was not "a substantial danger" that the jury would consider the argument as based on matters outside the record.

And the court sustained defendant's objection and struck the questionable portion of the argument. It also repeatedly instructed the jury that the attorneys' arguments were

29

not evidence (CALCRIM Nos. 104, 222).  In addition, "We presume the jurors treated 'the prosecutor's comments as words spoken by an advocate in an attempt to persuade.'" (*Cole*, *supra*, 33 Cal.4th at p. 1204.)  Accordingly, no prejudice resulted under any standard.

**6.      Denial of motions for mistrial and continuance**

Defendant contends, "The multiple errors in trial were incurable by admonition. The court erred therefore when it denied [defendant's] numerous motions for mistrial.  In the absence of granting a mistrial, the court, at a minimum, should have granted [defendant's] requests for a continuance."  The portion of defendant's brief addressing this contention does so in a conclusory fashion and does not include any citations to the record.  Because appellate procedures require defendant, not this court, to cite the portions of the record that support his contentions on appeal (*Guthrey v. State of California* (1998) 63 Cal.App.4th 1108, 1115), we limit our consideration to the denial of motions for mistrial and continuance concerning defendant's preceding five appellate contentions.  These are his motion for a mistrial at the conclusion of Pavek's testimony to the extent it was based upon failure to disclose the photographs of the car keys in Raul's hand and the sword, his renewals of that mistrial motion, his requests for a continuance of unspecified duration while making those renewed motions for mistrial, his motions for mistrial based upon Fierroz's references in her testimony to defendant's community service and Raul's concern that something was going to happen at his mother's house, his motion for mistrial based upon the prosecutor asking Shipe whether defendant was honest in the April 9 interview, his motion for a mistrial based upon the prosecutor's questioning of Juarez, and his motion for a mistrial after the prosecutor asked defendant if he told Raul he would "kill the first person out of the house" if Raul did not leave Fierroz alone.

The trial court should grant a mistrial if it "'is apprised of prejudice that it judges incurable by admonition or instruction.  [Citation.]  Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with

30

considerable discretion in ruling on mistrial motions.'" (*People v. Wallace* (2008) 44 Cal.4th 1032, 1068, quoting *People v. Haskett* (1982) 30 Cal.3d 841, 854.) "Whether a particular incident is incurably prejudicial requires a nuanced, fact-based analysis." (*People v. Chatman* (2006) 38 Cal.4th 344, 369–370.) We review the denial of a motion for mistrial for abuse of discretion. (*Wallace*, at p. 1068.)

As previously addressed in discussion of defendant's claims regarding purported prosecutorial misconduct and the delayed disclosure of photographs of the sword and the car keys, no misconduct or prejudicial error occurred. Accordingly, the trial court did not abuse its discretion by denying the motions for mistrial pertaining to these issues.

A motion for a continuance requires a showing of good cause. (§ 1050, subd. (e).) The trial court has broad discretion to grant or deny a continuance. (*People v. Smithey* (1999) 20 Cal.4th 936, 1011.) With respect to a request for a continuance to obtain evidence, the moving party must "show both the materiality of the evidence necessitating the continuance and that such evidence could be obtained within a reasonable time." (*People v. Beeler* (1995) 9 Cal.4th 953, 1003.) The trial court must consider the benefit anticipated by the moving party, the likelihood that such benefit will result, the burden of a continuance on the court, and whether substantial justice will be accomplished or defeated by granting a continuance. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1125– 1126.) In ruling on a motion for a continuance in the midst of trial, the trial court must also consider the burden on witnesses and jurors. (*People v. Fudge* (1994) 7 Cal.4th 1075, 1105.) In addition, a defendant seeking a midtrial continuance must show diligence in preparing for trial. (*Id.* at p. 1106.)

Defendant first mentioned a continuance the day after Pavek testified, before Dr. Markman was called as a witness. The prosecutor had complained of inadequate and belated discovery regarding Markman's proposed testimony and said she had not had sufficient time to prepare to cross-examine him on certain topics. The court found no discovery violation, but offered to give the prosecutor "a brief delay" if she needed it. Defense counsel argued that if the trial court did not grant his renewed mistrial motion he

was "going to need a delay in this trial to develop the sword issue and call witnesses and prepare for it. So we might have a delay anyway." The trial court did not address a continuance for the defense, but told the prosecutor, "I will give you over the lunch hour before you do your cross."

Defendant's reference to needing a delay was not really a motion for a continuance and was not supported by a showing that defendant would be able to obtain any evidence material to the sword issue within a reasonable time.

After the court sent the jury to lunch, defendant made his first real motion for a continuance. After complaining of numerous acts and omissions by the prosecutor, defense counsel stated, "What I am getting at is, I am asking for a continuance. I am asking for a mistrial. But I want a continuance to develop the issue of the sword. [¶] I also now, unfortunately—and I never thought I had to—I have to file a *Pitchess* [*v. Superior Court* (1974) 11 Cal.3d 531] motion. I have to. Because there's something very suspicious going on in this case." The court deferred ruling on the motion.

During a brief recess between direct and cross-examination of defendant, defendant renewed his motion for a mistrial, referred to the delayed disclosure of the photographs of the sword and the car keys, and said, "I need an opportunity to develop that issue. A good example would be to have that item to fingerprint it. I have a fingerprint expert." Defense counsel also said, "I would like the keys. I would like to maybe do fingerprint evidence on the keys. [¶] I would like to do some information which sets up the argument about my client's state of mind and how it relates with the victim in a self-defense case is not only armed with weapons but also has weapons in his possession at the murder scene." Later defense counsel added, "I could hire an accident reconstructionist . . . to come into court, potentially, and do how someone exits a car with an item like that, how a reasonable person could have thought that was a weapon and feared for his life." Defendant said that he was asking for a mistrial, but "[i]f that's not granted, I want a reasonable continuance."

32

The court deferred ruling on defendant's motions until the end of the day, when it expressly denied his motion for a mistrial. The court noted that it had initially excluded evidence of the sword unless there was evidence that defendant saw it in Raul's hand, but decided to admit it after the prosecutor asked various officers if they saw any weapons in the car. The court found there was no intentional suppression of the photograph, which neither the prosecutor nor the investigating officer had, and the court noted that defendant now had the photograph and could use it to support his defense. Defendant said, "I would still like a continuance. I want to know what impound yard. I want to know what civilians or workers were there. I want to know if anyone saw that. Did it just disappear?" The court stated it understood and asked Shipe if he knew where "that item is." Shipe said he did not. The court stated, "Here's what we are going to do. Tomorrow, though, we are going to wrap up with the testimony of the defendant. We may end up going dark on Friday so [defense counsel] has an opportunity to look into this. [¶] And then we'll finalize these issues tomorrow." The court had previously noted that it would be in session only until noon the next day.

At the end of the morning on the next day of trial, defendant told the court that one day of recess was insufficient. Counsel explained, "I have hired an investigator . . . . And he said he was going to look into this issue. I have to go over some reports with him, of course. [¶] And then just the last issue, because I don't see how respectfully that no one in the sheriff's department saw that item. . . . I need to do and file some *Pitchess* motions. [¶] I just wanted to say that and put it on the record. And I know, because I just filed one and I was litigating that today in Pomona—but another lawyer is there for me—21 days' notice." The court implicitly denied the motion for a continuance, stating it viewed the sword as "somewhat of a red herring. I understand why you're trying to track it down. I do. Because you simply want to know what happened to it. I understand that. So that's why I did give you a brief continuance. A day off tomorrow." The court added, "Obviously we are not going to continue the case for 21 days for a *Pitchess* motion, but it's on the record and noted."

Defendant did not show good cause for a continuance. No one knew what happened to the sword, which had disappeared from Raul's car sometime after it was towed from his father's house to the impound yard on April 9, two and one-half years before trial. The investigating officer, Shipe, did not know where it was. If the impound yard still possessed the sword, the defense investigator could have retrieved it in the day and one-half available before trial resumed. But if the impound yard did not have the sword, there was no reasonable probability it would ever be found, and a continuance would not benefit defendant. Neither fingerprinting nor DNA testing could be performed on an item that was missing. As alternatives to introducing the sword itself, defendant introduced Pavek's photograph of the sword and her testimony that it appeared to be an actual sword and a weapon. The status of a sword as a weapon was not a subject requiring expert testimony. Because Raul neither got out of the car nor retrieved the sword (as shown by the position of Raul's body in the car, the position of the sword on the back seat floor, and Pena's testimony), expert testimony on "how someone exits a car with an item like" the sword was irrelevant. A 21-day continuance for a *Pitchess* motion would have placed a substantial burden upon the jurors, who had sat through 10 days of jury selection and trial, and defendant could not show any likelihood that such a motion would provide him with any material evidence. If there were any discoverable records for any officers who were the subject of such a motion, a longer continuance would be required to permit the defense to find and interview those who had filed complaints against those officers. Thus, defendant did not and could not show any likelihood that he could obtain material evidence within a reasonable time, or at all, if a continuance were granted. The trial court's denial of a continuance was not an abuse of discretion.

7. **Admission of jail conversation**

Defendant contends the trial court erred by admitting his conversation in jail with Ruiz because Ruiz was acting as a government agent "operating under an implied agreement" and thus recording the conversation violated defendant's right to counsel.

34

*Massiah v. United States* (1964) 377 U.S. 201 [84 S.Ct. 1199] (*Massiah*) bars the admission at trial of any incriminating statement deliberately elicited by the government in the absence of counsel after the right to counsel has attached.  To establish a *Massiah* claim, defendant must show that Ruiz was acting as a government agent, that is, under the direction of the government pursuant to a preexisting arrangement, with the expectation of some resulting benefit or advantage, and that Ruiz deliberately elicited incriminating statements.  (*People v. Williams* (1997) 16 Cal.4th 153, 203–204.)  No *Massiah* violation occurs if the police merely arrange to accept information elicited by an informant on his or her own initiative, without guidance, promises, or encouragement from police.  (*Id.* at p. 204.)

At the Evidence Code section 402 hearing on defendant's *Massiah* motion, Shipe recalled asking Ruiz on one occasion, but not repeatedly, "Do you want to be a witness or do you want to be a suspect?"  Shipe did not remember asking Ruiz to be a witness for the government.  Defense counsel asked if Shipe had listened to the recordings of the three interviews with Ruiz.  Shipe said, "Not recently."  Defense counsel asked, "Well, did you tell Ernesto Ruiz that you wanted him to be a witness and get information against [defendant]?"  Shipe replied, "I don't remember the exact context of that conversation.  But if you have the transcript, I would be more than happy to read it and refresh my memory and testify to it now."  Counsel declined to show Shipe the transcripts, saying, "I think that's going to be very lengthy that way."  The court then asked Shipe whether at some point he asked Ruiz, "[H]ey, are you a witness or are you a suspect?"  Shipe agreed he had.  The court asked, "And, of course, you were trying to get information about your investigation and Mr. Ruiz's role in the investigation.  And conversely, [defendant's] role.  Is that correct?"  Shipe agreed it was.  The court asked whether, before Shipe caused defendant and Ruiz to be placed together in a cell with a recording device, Shipe told Ruiz "to go in there and elicit information from [defendant] regarding the case?"  Shipe replied, "No, I did not."  On further questioning by the court, Shipe denied that he at any time asked Ruiz "to act as an agent on behalf of the Sheriff's Department to gather

35

information from [defendant]," gave Ruiz any instructions before placing him in the cell with defendant, told Ruiz the cell had a recording device, or told Ruiz to do anything to stimulate conversation with defendant about the facts of this case. On further questioning by defense counsel, Shipe denied telling Ruiz "that the only way he is getting out of this is if he goes in and talks to [defendant]."

The court deferred ruling and noted that defendant wanted Ruiz to testify at the Evidence Code section 402 hearing. When the court took up the issue again, Ruiz refused to testify. The court denied the motion, stating, "There's no evidence the detectives asked Mr. Ruiz to act on their behalf and I am making a finding he was not a government agent."

The trial court's ruling was correct. Defendant did not establish that Ruiz was acting as a government agent during the jail conversation with defendant (or at any other time). Shipe did not admit he did so and defendant did not point out any statements during the recorded interviews with Ruiz that supported his theory.

We note that the trial court had reviewed the transcripts of all three interviews with Ruiz before ruling on Ruiz's motion to suppress his statements on the theory they were obtained in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 [86 S.Ct. 1602]. In making its ruling on Ruiz's *Miranda* motion, the court read portions of those transcripts into the record, including the portions about Ruiz being "a witness." In pertinent part, during the second interview Ferguson said to Ruiz, "'Okay. And we have certain evidence and we know certain things. So I'm just going to cut to the chase. This is what—either way it can unfold. In this interview today, you can either come away still being a witness, because I don't think—I personally don't think you shot anybody. In fact, I know you didn't. But you may have been involved in other ways. Which if you lie about it, then suddenly you're going to become a suspect and we're going to end up booking you. Okay?'" Later in the same interview, Shipe stated, "'If you're truthful with us today, you know, this is the difference. Like he said, it's between you being a witness and a suspect. And we have physical evidence that shows your mom's car on the

mission, which puts you directly into this case. If you are truthful, you know, you are a witness.'" A little later, Ferguson said, "'[R]ight now, all bullshit aside, you are just a witness at this point. You are just talking to us. But when you keep lying, what do you think that's going to make you?'" Ruiz responded, "'A liar?'" Ferguson replied, "'No. Well, yes. But a suspect.'" In the third interview, Ruiz stated, "'You guys told me I could be a witness or I could be a suspect. And now you guys are making me think that I am going to be a suspect. And I don't want to be a suspect. And I'm just trying to be truthful.'"

Accordingly, even if defendant had shown Shipe or the court these portions of the Ruiz interviews, he would have failed to show that Ruiz was acting as a government agent during the jail conversation with defendant.

## 8. Failure to instruct upon heat of passion

The trial court instructed the jury on first and second degree murder, self-defense, and voluntary manslaughter based upon unreasonable self-defense. (CALCRIM Nos. 505, 520, 521, 571.) It also instructed on provocation, using CALCRIM No. 522: "Provocation may reduce a murder from first degree to second degree and may reduce a murder to manslaughter. The weight and significance of the provocation, if any, are for you to decide. [¶] If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. Also, consider the provocation in deciding whether the defendant committed murder or manslaughter."

Defendant contends that the trial court erred by failing to instruct, sua sponte, on heat of passion as a basis for voluntary manslaughter. He argues, "A reasonable person in [defendant's] position would have been incensed and outraged that another man was occupying the role of father to his son, particularly when [defendant] specifically asked him not to do so. [¶] To [defendant], it was a matter of respect."

"[A] trial court is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence. [Citation.] It is error for a trial court not to

instruct on a lesser included offense when the evidence raises a question whether all of the elements of the charged offense were present, and the question is substantial enough to merit consideration by the jury. [Citation.] When there is no evidence the offense committed was less than that charged, the trial court is not required to instruct on the lesser included offense. [Citation.]" (*People v. Booker* (2011) 51 Cal.4th 141, 181.) "On appeal, we review independently whether the trial court erred in failing to instruct on a lesser included offense." (*Ibid.*) Substantial evidence in this context is "evidence from which a jury composed of reasonable persons could conclude that the facts underlying the particular instruction exist." (*People v. Blair* (2005) 36 Cal.4th 686, 745.)

"Where an intentional and unlawful killing occurs 'upon a sudden quarrel or heat of passion' (§ 192, subd. (a)), the malice aforethought required for murder is negated, and the offense is reduced to voluntary manslaughter—a lesser included offense of murder." (*People v. Carasi* (2008) 44 Cal.4th 1263, 1306 (*Carasi*.) "[T]he passion aroused need not be anger or rage, but can be any ""'[v]iolent, intense, high-wrought or enthusiastic emotion'"" [citations] other than revenge." (*People v. Breverman* (1998) 19 Cal.4th 142, 163.)

Heat of passion has both objective and subjective components. (*People v. Moye* (2009) 47 Cal.4th 537, 549.) To satisfy the objective component, the claimed provocation must be sufficient to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection, from passion rather than from judgment. (*Carasi*, *supra*, 44 Cal.4th at p. 1306.) "To be adequate, the provocation must be one that would cause an emotion so intense that an ordinary person would simply *react*, without reflection. . . . [T]he anger or other passion must be so strong that the defendant's reaction bypassed his thought process to such an extent that judgment could not and did not intervene." (*People v. Beltran* (2013) 56 Cal.4th 935, 949 (*Beltran*).) "'The provocation . . . must be caused by the victim [citation], or be conduct reasonably believed by the defendant to have been engaged in by the victim.'" (*Moye*, at pp. 549–550.) A defendant may not ""'set up his own standard of conduct and justify or excuse

himself because in fact his passions were aroused . . . .""" (*Cole*, *supra*, 33 Cal.4th at pp. 1215–1216, quoting *People v. Steele* (2002) 27 Cal.4th 1230, 1252.) "To satisfy the subjective element . . . the accused must be shown to have killed while under 'the actual influence of a strong passion' induced by such provocation." (*Moye*, at p. 550.)

"'[I]f sufficient time has elapsed between the provocation and the fatal blow for passion to subside and reason to return, the killing is not voluntary manslaughter—"the assailant must act under the smart of that sudden quarrel or heat of passion."'" (*Beltran*, *supra*, 56 Cal.4th at p. 951.) Or if the evidence shows that defendant's passion actually cooled after the provocation, as shown by his "'transaction of other business in the meantime, rational conversations upon other subjects, evidence of preparation for the killing, etc.,'" heat of passion is inapplicable. (*People v. Golsh* (1923) 63 Cal.App. 609, 617.)

We conclude the trial court was not required to instruct upon voluntary manslaughter based upon heat of passion because substantial evidence did not support a finding that he killed Raul while under the actual influence of a strong passion induced by adequate provocation. Defendant testified that he was angry about getting a black eye in the fight and wanted to vandalize Raul's house, but when Raul began to get out of his car with an object defendant thought might be a gun or a knife, defendant was frightened and shot at Raul. The fistfight could not be provocation because the shooting occurred roughly a day and one-half after the fight, and defendant's conduct in the interim, such as leaving deceptive messages for Fierroz, partying, and preparing to, at a minimum, exact revenge on Raul by committing vandalism at the home of Raul's father demonstrated that any passion defendant experienced as a result of the fight had actually cooled. Neither defendant's testimony nor any other evidence tended to show that when defendant shot Raul, defendant's reason was overcome by any intense emotion caused by Raul (other than fear, which was fully addressed in the self-defense and unreasonable self-defense instructions, which the jury apparently found inapplicable). Defendant did not testify or tell anyone, for example, that he shot Raul because he was enraged that Raul had been

39

spending time with defendant's son. Notably, Raul was at his own family's home, and, as far as the record reveals, defendant's son was not present when defendant shot Raul. Defendant had apparently last seen his son in Raul's presence five days earlier when Fierroz, Raul, defendant, and defendant's son were all at the hospital. No evidence indicated that defendant's reason was overcome by passion at the hospital, or that any further acts of Raul with respect to defendant's son had occurred in the interim.

Even if we were to conclude that the trial court should have instructed on heat of passion on the theory that defendant's fear of Raul having a weapon constituted the "passion," the omission of the instruction was not prejudicial under any standard, as demonstrated by the jury's rejection of self-defense and voluntary manslaughter based upon unreasonable self-defense.

Defendant further contends that the failure to instruct on heat of passion violated due process. Because the evidence did not support the instruction, the omission of the instruction violated neither state law nor any aspect of due process.

## 9. Denial of motion for a new trial

Defendant contends the trial court erred by failing to grant his new trial motion to the extent it was based upon the failure to instruct on heat of passion.

"A trial court may grant a motion for new trial only if the defendant demonstrates reversible error." (*People v. Guerra* (2006) 37 Cal.4th 1067, 1159, overruled on another point by *People v. Rundle* (2008) 43 Cal.4th 76, 151.) Because we conclude the trial court did not err by failing to instruct upon heat of passion, we necessarily conclude omission of that instruction did not entitle defendant to a new trial.

40

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED.

MALLANO, P. J.

We concur:

ROTHSCHILD, J.

JOHNSON, J.